UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| BZ CLARITY TENT SUB LLC, d/b/a BASE ENTERTAINMENT,<br><br>         Plaintiff(s),<br><br> v.<br><br>ROSS MOLLISON INTERNATIONAL PTY, LTD.,<br><br>         Defendant(s). | Case No. 2:15-CV-1065 JCM (CWH)<br><br>ORDER |

Presently before the court are plaintiff BZ Clarity Tent Sub LLC, dba BASE Entertainment's ("BASE") motion for temporary restraining order (doc. # 5) and motion for preliminary injunction (doc. # 6). Defendant Ross Mollison International Party, Ltd. ("RMP") has not filed a response.[1]

**I. Background**

Plaintiff BASE and defendant RMP are co-producers of "Absinthe," a live performance show at Caesar's Palace in Las Vegas. (Doc. # 1-3 at 7). Absinthe is a variety show with various acrobatic, dance, burlesque, and comedic acts. (Doc. # 4-1 at 4). Despite rotations in acts and

---

[1] The instant action initiated in state court. As the court will discuss, the parties had fully briefed a motion for TRO and motion for preliminary injunction in state court before removing to this court. Though BASE has filed new motions for TRO and preliminary injunction applying the Federal Rules of Civil Procedure, the court will consider defendant RMP's response (doc. # 4-1) and other prior briefing from the state court proceeding. Courts "may take notice of proceedings in other courts, both within and without the federal system, if those proceedings have a direct relation to matters at issue." *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (citations omitted). On this basis, the court finds it appropriate to take judicial notice of the prior briefing in the state court, though not directly in response to BASE's instant motion.

**James C. Mahan**
**U.S. District Judge**

performers, the show is always hosted by "the Gazillionaire" character and his assistant. (Doc. # 4-1 at 4).

On January 23 2011, BASE and RMP entered into the Absinthe production agreement ("the contract"). (Doc. # 1-3 at 30; doc. # 4-1 at 28).[2] The contract provided for a 26-week expected run of the show from execution date through September 18, 2011. (Doc. # 4-1 at 31). The contract outlined the roles and responsibilities of each party. (Doc. # 1-4). For example, BASE agreed to provide the start-up funding—a maximum of $1.25 million—for the production. (Doc. # 4-1 at 28). RMP agreed to produce and manage the artistic elements of the show. (Doc. # 4-1 at 28).

The contract also set a weekly operating budget that BASE would provide, as well as requirements for increasing or decreasing that budget, who would be liable for cost overruns, and how those overrun expenses would be handled by the parties.

Though the contract explicitly stated that the parties were not creating a partnership or joint venture, BASE and RMP agreed that many decisions would require mutual agreement by both BASE and RMP. (Doc. # 4-1 at 32). These decisions included all artistic elements, the show's production, design, music, casting, creative team, and any replacement acts as well as all marketing and advertising decisions and plans. (Doc. # 4-1 at 29-30).

On September 16, 2011, BASE and RMP entered an agreement to extend the term of the contract by perpetual ongoing six-month terms at BASE's option ("the amendment"). (Doc. # 1-3 at 38; doc. # 4-1 at 36).[3] The amendment did not re-address and redraft every provision of the contract, but did amend certain provisions. (Doc. # 4-1 at 38). The parties provided that any part of the contract that the amendment did not explicitly amend would remain in full force and effect. (Doc. # 4-1 at 38).

At some point BASE and RMP's cooperative relationship began to deteriorate. The parties appear to be wrestling for control over the show, royalties, licensing fees, marketing, and various other issues. (*See, e.g.*, doc. # 4-1 at 40-52).

---

[2] The parties each provide a copy of the contract at the noted docket numbers.

[3] The parties each provide a copy of the amendment at the noted docket numbers.

**James C. Mahan**
**U.S. District Judge**

- 2 -

1  BASE filed the instant complaint in the Clark County Business Court (Case No. A-15-717903) in Nevada on May 5, 2015, alleging claims for breach of contract, declaratory relief, intentional interference with contractual relations, breach of the covenant of good faith and fair dealing, and accounting.  (Doc. # 1-2).  BASE also seeks declaratory and injunctive relief, damages, and attorneys' fees and costs.  BASE filed concurrent motions for temporary restraining order ("TRO") and preliminary injunction with the state court, which Business Court Judge Denton set for hearing on May 14, 2015.  (*See* doc. # 1-3).

Rather than oppose the motion, RMP filed a motion to vacate the hearing.  Judge Denton denied RMP's motion to vacate and set a new hearing date of May 21, 2015, to hear arguments on the motions for TRO and preliminary injunction.

The parties fully briefed the motions for TRO and preliminary injunction and the court heard arguments on the motions.  However, shortly after the parties argued the motions, Judge Denton issued an interim order disclosing that his law clerk had been recently hired by RMP's legal counsel, and sought responses on whether the court should recuse itself from the state court litigation.

On May 29, 2015, Judge Denton recused himself to avoid the appearance of impropriety, and the case was reassigned to Business Court Judge Delaney.  Judge Delaney set an initial hearing for June 9, 2015.  RMP removed this action on June 5, 2015.  (Doc. # 1).[4]

As Judge Delaney had not considered the motions for TRO or preliminary injunction, this court took the motions under advisement.  Before the court could issue an order addressing BASE's motions for TRO and preliminary injunction that had been carried over from the state court proceedings, BASE filed revised motions for TRO and preliminary injunction.  (Docs. ## 5, 6).  The court now addresses these revised motions.

**II.    Legal Standard**

Under Federal Rule of Civil Procedure 65, a court may issue a temporary restraining order when the moving party provides specific facts showing that immediate and irreparable injury, loss,

---

[4] Though the parties fully briefed the TRO in state court, RMP's removal documents did not include all of the necessary documents for this court to decide the merits of the TRO. Accordingly, RMP filed a supplement to the petition for removal on June 8, 2015.  (Doc. # 4).

James C. Mahan
U.S. District Judge

- 3 -

1  or damage will result before the adverse party's opposition to a motion for preliminary injunction
2  can be heard.   Fed. R. Civ. P. 65.

3  "The purpose of a temporary restraining order is to preserve the status quo before a
4  preliminary injunction hearing may be held; its provisional remedial nature is designed merely to
5  prevent irreparable loss of rights prior to judgment." *Estes v. Gaston*, No. 2:12-cv-1853-JCM-
6  VCF, 2012 WL 5839490, at *2 (D. Nev. Nov. 16, 2012) (citing *Sierra On-Line, Inc. v. Phoenix*
7  *Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984)).  "Thus, in seeking a temporary restraining
8  order, the movant must demonstrate that the denial of relief will expose him to some significant
9  risk of irreparable injury."  *Id.* (quoting *Associated Gen. Contractors of Cal. v. Coal. of Econ.*
10 *Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991)).

11 The Supreme Court has stated that courts must consider the following elements in
12 determining whether to issue a temporary restraining order and preliminary injunction: (1) a
13 likelihood of success on the merits; (2) likelihood of irreparable injury if preliminary relief is not
14 granted; (3) balance of hardships; and (4) advancement of the public interest.  *Winter v. N.R.D.C.*,
15 555 U.S. 7, 20 (2008).  The test is conjunctive, meaning the party seeking the injunction must
16 satisfy each element.

17 Additionally, post-*Winter*, the Ninth Circuit has maintained its serious question and sliding
18 scale test.  *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011).  "Under this
19 approach, the elements of the preliminary injunction test are balanced, so that a stronger showing
20 of one element may offset a weaker showing of another."  *Id.* at 1131.  "Serious questions going
21 to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance
22 of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of
23 irreparable injury and that the injunction is in the public interest."  *Id.* at 1135.

24 **III.    Discussion**

25 The disagreement between the parties has quickly escalated since the initiation of the
26 lawsuit a mere few weeks ago.  The issues the court considers at this time are limited to BASE's
27 motions for TRO and preliminary injunction.
28

**James C. Mahan**
**U.S. District Judge**

The instant TRO seeks to enjoin a new ticketing system that RMP launched unilaterally on the Absinthe website. (Doc. # 1-3 at 9). According to BASE, it has partnered with Ticketmaster to coordinate ticketing for Absinthe since before the first show. (Doc. # 1-3 at 9). BASE asserts that the express language of the contract and the amendment has always granted it (and not RMP) the exclusive right to ticketing. (Doc. # 1-3 at 9-10).

Further, BASE asserts that the past conduct of the parties (namely that BASE has maintained exclusive control of Absinthe ticketing from the inception of the show), the contract, and amendment affirm BASE's oversight of all ticketing responsibilities in conjunction with Ticketmaster. (Doc. # 1-3 at 9). However, on April 29, 2015, RMP released a press release announcing the launch of its own, separate ticketing system that same day to sell tickets to Absinthe shows. (Doc. # 1-3 at 9).

BASE asserts that this newly and unilaterally-launched ticketing system breaches the parties' contract. (Doc. # 1-3 at 9). BASE asserts that RMP's ticketing system launch is an improper system that aims to seize control of all box office revenue and does not coordinate with Ticketmaster sales. (Doc. # 1-3 at 10). Further, BASE asserts that RMP's new ticketing system threatens to wreak havoc on the show's reputation and future sales. (Doc. # 1-3 at 10). BASE alleges that, because the RMP ticketing system does not coordinate with Ticketmaster, multiple tickets can be sold to the same seat at the same show. Accordingly, BASE applied for the instant TRO.

RMP does not dispute that BASE has exercised control over ticketing in the past. (Doc. # 4-1 at 6). However, RMP alleges that it uncovered fraud in BASE's relationship with Ticketmaster. (Doc. # 4-1 at 7). Specifically, RMP asserts that BASE has been receiving commissions from Ticketmaster totaling nearly $500,000, despite warranting to RMP that no such commission agreement existed.

RMP further asserts that BASE has "known since at least March, 2014, that RMP was examining exercising its rights [over ticketing sales] to ensure the proper handling of ticket sales" and that the parties engaged in significant discussions in September and October 2014 regarding RMP's plan to exercise its ticketing rights. (Doc. # 4-1 at 7).

In a June 5, 2015, letter, RMP further asserts that it will exercise its right of rescission based upon the fraud of BASE and considers the contract and amendment to be "void as a result of BASE's fraudulent conduct." (Doc. # 6-8 at 2). RMP further asserts that it will not honor or accept any tickets sold by Ticketmaster after June 23, 2015, for the show, and that RMP will act as the sole ticket broker/seller for all Absinthe performances after that date. (Doc. # 6-8 at 2).

*A. Likelihood of success on the merits*

To succeed on a breach of contract claim, a plaintiff must show four elements: (1) formation of a valid contract; (2) performance or excuse of performance by the plaintiff; (3) material breach by the defendant; and (4) damages. *See Bernard v. Rockhill Dev. Co.*, 103 Nev. 132, 734 P.2d 1238, 1240 (1987) ("A breach of contract may be said to be a material failure of performance of a duty arising under or imposed by agreement.") (quoting *Malone v. Univ. of Kan. Med. Ctr.,* 220 Kan. 371, 552 P.2d 885, 888 (1976)).

*1. Whether a valid contract existed between BASE and RMP*

Both parties appear to agree that the contract and its amendment controlled the relevant obligations and duties of each party. Accordingly, the court looks to the contract and its amendment for purposes of evaluating the likelihood of BASE's success on the merits with respect to its claims.

*2. Performance or excuse of performance by BASE*

RMP argues that BASE materially breached the terms of the parties' contract. Therefore, RMP alleges that BASE failed to perform under the contract and, accordingly, cannot establish a likelihood of success on the merits.

A material breach by one party to a contract may excuse further performance by another party to the contract. *See Young Elec. Sign Co. v. Fohrman,* 466 P.2d 846, 847 (Nev. 1970). "[T]he party who commits the first breach of a contract cannot maintain an action against the other for a subsequent failure to perform." *Bradley v. Nev.-Cal.-Or. Ry.,* 178 P. 906, 908–09 (Nev. 1919). However, "a party is not automatically excused from the future performance of contract obligations every time the other party commits a breach; if the breach is relatively minor and not

**James C. Mahan**
**U.S. District Judge**

- 6 -

of the essence, the plaintiff is still bound by the contract and may not abandon performance . . . ." 23 Williston on Contracts § 63:3 (4th ed. 2007).

Whether a party has committed a material breach of contract turns upon the seriousness of the breach and the likelihood that the injured party received substantial performance of the contract promise. AMJUR CONTRACTS § 706. Generally, a material breach occurs when there is a breach of an essential element of the contract which induced the party to enter into it. Further, the breach must go to the substance of the contract, or defeat an essential purpose of the contract. *Id.*

RMP argues that BASE materially breached the contract by receiving commissions from Ticketmaster, when BASE twice warranted that it was not. (Doc. # 4-1 at 10-11). RMP asserts that the parties' contract and amendment stated that BASE could not receive third-party income from the Absinthe production, specifically including ticket companies like Ticketmaster. (Doc. # 1-3 at 35 § VI(n), 40 § 7(c)). Therefore, RMP asserts that BASE's receipt of nearly $500,000 from Ticketmaster was a material breach of contract and BASE's warranties that it was not receiving commissions constitute fraud.

BASE responds that RMP's Ticketmaster issue is a "red-herring providing a convenient excuse" for RMP's attempt to take control of ticketing. BASE asserts that the money Ticketmaster paid to BASE was a "credit[ on] an advance made to BASE prior to the 2011 amendment from tickets sold at Absinthe" and not a commission. (Doc. # 4-1 at 47). BASE asserts that the credit process was already in place before the parties' amendment and was with respect to all BASE ticketing, not just Absinthe, and that BASE "simply missed making this part of [BASE and RMP's] deal." (Doc. # 4-1 at 47). In any case, BASE maintains that the mistake on its part cannot be said to be a material breach when RMP has continually overrun its budget and owes BASE in excess of $250,000 under the contract.

BASE and Ticketmaster entered into a contract in 2007—before the idea for Absinthe was conceived—for all of BASE's current and future projects. Under the 2007 Ticketmaster contract, Ticketmaster provided BASE $2 million advance, which Ticketmaster required BASE to repay in full. The 2007 Ticketmaster contract entitled BASE to ticket sales royalties on a calendar year basis. However, prior to seeing any royalties, BASE would have to repay the $2 million advance.

Any portion of the $2 million advance not recouped by Ticketmaster must be repaid to Ticketmaster by a specified repayment schedule.

Section VI(r) of BASE and RMP's contract provides that, in the event of a discrepancy in BASE's books, BASE shall promptly reimburse RMP for the amounts due." (Doc. # 1-3 at 35). Emails submitted by BASE demonstrate that BASE immediately attempted to rectify the discrepancy with the Ticketmaster issue when RMP brought the issue to BASE's attention. Further, BASE notes that it still owed Ticketmaster money under its advance agreement up until December 2014, which discredits the idea that BASE was secretly receiving money from Ticketmaster and purposefully hiding that money.

The court recognizes that the parties specifically contracted to address RMP's concern over BASE receiving third-party commissions in an attempt to cut RMP out. However, numerous factors weigh against BASE's breach being material including: (1) the Ticketmaster/BASE contract applied to all BASE endeavors and had been entered into in 2007 (long before Absinthe); (2) BASE immediately attempted to rectify the issue when notified by both making restitution on any amount owed and incorporating any future profit split into the parties' contract; (3) BASE was still paying off its advance and thus had not been receiving any funds from Ticketmaster when RMP brought the issue to BASE's attention; (4) the maximum possible portion RMP would be entitled to is $250,000, a meager amount when weighed against RMP's $9,300,000.00 in profit; (5) RMP potentially owes BASE far in excess of $250,000 under the parties' contract based on overrun budgets; and (6) BASE appears to have performed every other requirement under the contract.

Accordingly, the court finds that BASE's breach, if there was one, was not significant enough to allow RMP to essentially throw the contract in its entirety out the window. The alleged breach was not "so fundamental" as to go to the "root" or the "essence" of the agreement and does not "defeat the object of the parties entering into the contract." 23 Williston on Contracts § 63:3 (4th ed. 2007).

. . .

. . .

**James C. Mahan**
**U.S. District Judge**

- 8 -

### *3.  Material breach by RMP*

BASE argues that a plain reading of the agreement and the conduct of the parties—which has required BASE to fund the entire show, undertake all financial risk for the show, and provide all "marketing management services" for the show—demonstrates that BASE has and has always had exclusive responsibility and management of all ticketing services for Absinthe.  (Doc. # 1-5 at 7).  Therefore, RMP's new ticketing system is an unequivocal breach of contract.  (Doc. # 1-5 at 7).  RMP responds that BASE has no exclusive right to ticketing and that BASE is seeking to have the court manufacture an exclusive right.  (Doc. # 4-1 at 9).

The court finds that BASE's assertions that, because its "marketing management services" have always included ticketing, the contract created an exclusive right for BASE to control ticketing unavailing.  Although the contract states that "BASE will provide group [ticket] sales support" for ten or more tickets, there is no exclusive right provided in the four corners of the contract.  (Doc. # 1-3 at 31).  Though the court does not doubt that BASE has, in all likelihood, taken on the responsibility of handling ticketing in previous years, the performance of that responsibility does not magically create an exclusive right for BASE to be the unilateral decider of all things ticketing-related.

In fact, other provisions and the overall tenor of the contract and amendment suggest that RMP and BASE share approval with respect to any large decision affecting the production.  These decisions explicitly include all marketing and advertising decisions and plans, any artistic elements, and appointment and termination of any managers and production crew.  Further, the amendment specifically mentions that all third-party agreements related to the production (including ticketing suppliers) must be provided to the other party.

Still, the contract and amendment are exceedingly clear that "RMP will only enter into contracts for the Production with the written approval of a BASE Co-CEO . . . ."  (Doc. # 1-3 at 32).  Accordingly, the court finds that the agreement was clearly not designed to allow one party to make a unilateral decision regarding a substantial change to the show's structure, systems, or finances, such as RMP's implementation of a new and independent ticketing system.  The court

**James C. Mahan**
**U.S. District Judge**

finds that RMP, by unilaterally and independently launching a new ticketing system, fundamentally and materially breached the parties' contract.

### 4. Damages

BASE will suffer damages as a direct result of RMP's ticketing system. RMP originally asserted in its state court filings that the new ticketing system would not sell tickets for dates prior to September 2015. RMP asserted the delayed timeline would minimize any the risk of double-selling of tickets. However, RMP has now accelerated the timeline for its new system to begin June 24, 2015, and has disavowed the entire contract. The Absinthe production is not only at risk of double-selling tickets and generating consumer ill-will – RMP attempts to end third-party contractual partnerships, which will almost certainly bring additional liability on BASE and RMP. The court finds that BASE has carried its burden on its claim for breach of contract.

BASE's complaint alleges five claims for relief. Because the court finds that BASE is likely to succeed on its claim for breach of contract, the court need not address whether plaintiff is likely to succeed on the merits of its remaining claims.

### B. Likelihood of irreparable injury

A plaintiff must show that an irreparable injury is likely, not merely possible, before a temporary restraining order may be issued. *Am. Trucking Ass'ns v. City of Los Angeles,* 559 F.3d 1046, 1052 (9th Cir. 2009), *reversed on other grounds by Am. Trucking Ass'ns v. City of Los Angeles*, 596 F.3d 602 (9th Cir. 2010)).

Here, RMP attempts to rescind the contract and has expressly demanded that BASE "not hold itself out as having any affiliation with Absinthe" nor "take any action on behalf of Absinthe." The court finds that BASE is likely to suffer irreparable harm if it is forced out of its connection to Absinthe based on RMP's decision, without a court order, that the contract has been rescinded.

### C. Balance of hardships

In seeking a TRO, a plaintiff must demonstrate that his claim presents a serious question of law and that the current litigation has merit so as to avoid undue harm to the defendant. *See Topanga Press, Inc. v. City of Los Angeles,* 989 F.2d 1524, 1528 (9th Cir. 1993).

**James C. Mahan**
**U.S. District Judge**

BASE's complaint has brought a cause of action for breach of contract, which the court finds is likely to succeed on the merits. The balance of hardships favors a business attempting to enforce a contract with a co-producer of a popular and successful show in order to maintain its business goodwill and client relationships/customer satisfaction. The balance of hardships favors BASE.

### D.  Public interest

Before granting a TRO the court must determine that an injunction is in the public's interest. *See Winter*, 555 U.S. at 20-22. The right to contract is fundamental and includes the privilege of selecting which companies and individuals one chooses to work with and under what terms the parties will work with one another. An injunction in this instance protects the public's interest in the integrity and enforceability of contracts. Therefore, the court finds that the public's interest favors the granting of a TRO in this instance.

### E.  Unclean hands defense

Because injunctive relief is equitable, "a court will take account of the possible existence of certain defenses that historically have been available in equity even though the applicant has presented a seemingly meritorious claim for an injunction [or TRO]." Wright & Miller, *Federal Practice and Procedure,* Civil § 2946, at 411. The question is "whether plaintiff's activity transgresses general equitable standards of conduct." *Id.* at 413.

Unlike true affirmative defenses, however, "[t]he unclean hands defense is not an automatic or absolute bar to relief; it is *only one* of the factors the court must consider when deciding whether to exercise its discretion and grant an injunction [or TRO]." *Id.* at 415 (emphasis added). "[T]he unclean hands doctrine should only apply when the egregiousness of the party's misconduct constituting the party's unclean hands and the seriousness of the harm caused by the misconduct collectively weigh against allowing the party to obtain such a remedy." *Las Vegas Fetish & Fantasy Halloween Ball, Inc. v. Ahern Rentals, Inc.*, 182 P.3d 764, 765 (2008).

RMP argues that injunctive relief is unavailable to BASE under the "unclean hands" doctrine because of BASE's "secret" receipt of Ticketmaster commissions. (Doc. # 4-1 at 11).

James C. Mahan
U.S. District Judge

- 11 -

For the reasons discussed above, the court finds that BASE's alleged misconduct is not egregious nor serious enough to collectively weigh against the other factors assessed.

### IV. Conclusion

After reviewing the documents and pleadings on file in this matter, the court finds that BASE has satisfied the requirements for issuance of a TRO.

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that plaintiff BZ Clarity Tent Sub LLC, dba BASE Entertainment's ("BASE") motion for temporary restraining order (doc. # 5) be, and the same hereby is, GRANTED.

IT IS FURTHER ORDERED that upon issuance of this order, plaintiff BZ Clarity Tent Sub LLC, dba BASE Entertainment shall deposit $1,000 with the clerk of court as security for this temporary restraining order.

IT IS FURTHER ORDERED that the court will set a hearing on the motion for a preliminary injunction (doc. # 6) for **Friday, June 19, at 10:00 AM in courtroom 6A.**

IT IS FURTHER ORDERED that RMP shall file its response to BASE's pending motion for preliminary injunction (doc. # 6) by 5:00 PM on Monday, June 15, 2015. BASE shall file its reply by 5:00 PM Wednesday, June 17, 2015.

DATED June 12, 2015 at 2:15 P.M.

_____
UNITED STATES DISTRICT JUDGE

**James C. Mahan**
**U.S. District Judge**