UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| BZ CLARITY TENT SUB LLC, d/b/a BASE ENTERTAINMENT,<br><br>                        Plaintiff(s),<br><br>      v.<br><br>ROSS MOLLISON INTERNATIONAL PTY, LTD.,<br><br>                        Defendant(s). | Case No. 2:15-CV-1065 JCM (CWH)<br><br>ORDER |

Presently before the court is plaintiff BZ Clarity Tent Sub LLC, dba BASE Entertainment's ("BASE") motion for preliminary injunction. (ECF No. 44). Defendant Ross Mollison International Party, Ltd. ("RMP") filed a response (ECF No. 52), and BASE filed a reply. (ECF No. 54).

**I.     Background**

Plaintiff BASE and defendant RMP are co-producers of "Absinthe," a live performance show at Caesar's Palace in Las Vegas. (ECF No. 44). Absinthe is a variety show with various acrobatic, dance, burlesque, and comedic acts. (*Id.*). Despite rotations in acts and performers, the show is always hosted by "the Gazillionaire" character and his assistant. (ECF No. 4-1 at 4).

On January 23, 2011, BASE and RMP entered into the Absinthe production agreement. (ECF No. 44 Exh. 1). The agreement "is intended to define the rights and responsibilities of BASE and RMP concerning [their] co-production of 'Absinthe' (as defined herein) at Caesars Palace in Las Vegas." (*Id.*) The production agreement provided for a 26-week expected run of the show from execution date through September 18, 2011. (*Id.*). The contract outlined the roles and responsibilities of each party. For example, BASE agreed to provide the start-up funding—a

**James C. Mahan**
**U.S. District Judge**

maximum of $1.25 million—for the production, and RMP agreed to produce and manage the artistic elements of the show.  (*Id.*).

The contract also set a weekly operating budget that BASE would provide, as well as requirements for increasing or decreasing that budget, delineated who would be liable for cost overruns, and outlined how those overrun expenses would be handled by the parties. (*Id.*). RMP retained all intellectual property rights to the Absinthe name globally. (ECF Nos. 52, Exh. C).

Though the contract explicitly stated that the parties were not creating a partnership or joint venture, BASE and RMP agreed that many decisions would require mutual agreement by both parties. These decisions included all artistic elements: the show's production, design, music, casting, creative team, and any replacement acts, as well as all marketing and advertising decisions and plans. (*Id.*).

The original production agreement was set to expire on September 18, 2011. (ECF No. 52, Exh. C at IV(a)). On September 16, 2011, BASE and RMP signed an amendment of the production agreement, extending the production agreement by ongoing six-month terms at BASE's option ("the amendment").  (ECF No. 44, Exh. 3). The parties provided that any part of the contract that the amendment did not explicitly amend, including section V(a), would remain in full force and effect. (*Id.*).

Section V(a) includes a provision that states, "this First and Matching Rights provision shall be in effect for five (5) years from the date of this Agreement and that a Party's First and Matching Rights will be lost, forfeited and terminated if such Party is offered an opportunity consistent with this provision by the other Party and declines to participate within (30) days after receiving written notice of such offer." (ECF No. 44, Exh. 1). The production agreement's fifth anniversary occurred on January 23, 2016. (*Id.*)

The production agreement and its subsequent amendments are controlled by the Caesars Palace License Agreement, which governs the show's use of Caesar's property. (ECF No. 52, Exh. E). RMP was not an original party to the agreement. On October 21, 2013, Caesars Palace, BASE, and Spiegelworld and its affiliates entered into the first amendment to the use and license agreement for the "Absinthe" production ("license amendment"). (*Id.*). The "term" of the "License

**James C. Mahan**
**U.S. District Judge**

- 2 -

shall commence on the Effective Date and continue for three (3) years," which is October 21, 2016. (*Id.*)

The license amendment then provides an option for renewal stating that "the Licensee shall have the mutual option to extend the First Renewal Period for an additional two (2) years, for a total of five (5) years from the Effective Date." (*Id.*). Finally, the license agreement specifies that any "additional extension(s) or renewal(s) of this Agreement or any agreement to present or produce the Show in Las Vegas during the Term or any such renewal shall require the written agreement of each party to this agreement." (*Id.*).

At some point, BASE and RMP's cooperative relationship began to deteriorate. The parties appear to be wrestling for control over the show, royalties, licensing fees, marketing, and various other issues. (*See, e.g.*, ECF No. 4-1 at 40-52).

BASE filed the instant complaint in the Clark County Business Court (Case No. A-15-717903) in Nevada on May 5, 2015, alleging claims for breach of contract, declaratory relief, intentional interference with contractual relations, breach of the covenant of good faith and fair dealing, and accounting. (ECF No. 1-2). The case was removed to this court on June 5, 2015. (ECF No. 1)

This court previously granted BASE's motion for a TRO and preliminary injunction enjoining RMP from selling tickets on a new system that it launched unilaterally on the Absinthe website. (ECF No. 21). Thereafter, BASE amended its complaint to add two new claims for anticipatory repudiation and declaratory relief (ECF No. 48) and filed the instant motion for a preliminary injunction to enjoin RMP "from unilaterally shutting down the [s]how in October of this year." (ECF No. 44).

**II.    Legal Standards**

   a.  *Preliminary Injunction*

It is well established that a plaintiff seeking a preliminary injunction must demonstrate each of the following: (1) a likelihood of success on the merits; (2) that he is likely to suffer irreparable harm in the absence of relief; (3) that the balance of equities tips in his favor; and (4)

**James C. Mahan**
**U.S. District Judge**

- 3 -

1  that an injunction is in the public interest.  *Winter v. N.R.D.C.*, 555 U.S. 7, 20 (2008).  The test is
2  conjunctive, meaning the party seeking the injunction must satisfy each element.

3  Post-*Winter*, the Ninth Circuit has maintained its serious question and sliding scale test.
4  *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011).  "Under this approach,
5  the elements of the preliminary injunction test are balanced, so that a stronger showing of one
6  element may offset a weaker showing of another."  *Id.* at 1131.  "Serious questions going to the
7  merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a
8  preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable
9  injury and that the injunction is in the public interest."  *Id.* at 1135 (quotations omitted).

   *b. Anticipatory Repudiation*

11  Parties are bound to the plain meaning of terms of the agreement that they sign. *See Ringle*
12  *v. Bruton*, 120 Nev. 82, 93 (2004) ("when a contract is clear, unambiguous, and complete, its terms
13  must be given their plain meaning and the contract must be enforced as written; the court may not
14  admit any other evidence of the parties' intent because the contract expresses their intent.") (citing
15  *Sandy Valley Assocs. v. Sky Ranch Estates*, 117 Nev. 948, 953–54, 35 P.3d 964, 967–68 (2001));
16  *accord Ellison v. California State Automobile Ass'n.*, 106 Nev. 601, 603 (1990) ("It has long been
17  the policy in Nevada that absent some countervailing reason, contracts will be construed from the
18  written language and enforced as written.").

19  Anticipatory repudiation occurs when a party, through conduct or language, makes a "clear,
20  positive, and unequivocal declaration of intent not to perform its duties arising under or imposed
21  by agreement." *Zhang v. Eighth Judicial Dist. Court of State ex rel. Cty. of Clark,* 120 Nev. 1037,
22  1040 (2004) (citing *Covington Bros. v. Valley Plastering, Inc.*, 93 Nev. 355, 360 (1977)),
23  *abrogated on other grounds by Buzz Stew, LLC v. City of N. Las Vegas*, 124 Nev. 224 (2008).
24  Anticipatory repudiation can be implied from conduct that prevents the other party from
25  performing, including "acts, conduct, or declarations of the party, evincing a clear intention to
26  repudiate the contract, and to treat it as no longer binding." *Cladianos v. Friedhoff*, 69 Nev. 41, 46
27  (1952).

**James C. Mahan**
**U.S. District Judge**

- 4 -

Once a party anticipatorily repudiates the contract, the other party is excused from performing thereunder and is entitled to damages. *See In Kahle v. Kostiner,* 85 Nev. 355, 455 P.2d 42, 44 (1969)*; Finnell v. Bromberg*, 79 Nev. 211, 225 (1963) ("Where a party bound by an executory contract repudiates his obligation before the time for performance, the promisee has . . . an option to . . . maintain an action at once for the damages occasioned by such anticipatory breach." (quoting 17 C.J.S. Contracts § 472, at p. 973)).

## III.  Discussion

In the instant request for a preliminary injunction, BASE claims that RMP has stated that it plans to breach the parties' contract by refusing to agree to a two-year "automatic extension" of the show. (ECF No. 44). BASE claims that the terms of the lease prohibit such action, and that BASE possesses an express unilateral right and option to continue its co-production of the show without RMP. (*Id.*). BASE claims that RMP's position runs contrary to the express language in the production agreement, misconstrues the terms of the lease, and is at odds with the understanding of all parties involved in drafting the lease. (*Id.*).

BASE asserts that RMP's actions threaten to devastate the Absinthe brand: contracts relating to the show have been "left in limbo," the Absinthe tent requires repairs and essential upkeep if the show is to continue in that location, and all parties remain uncertain as to the future of the show. (ECF No. 44). BASE claims that if RMP's "threatened walk away" is allowed, it will irreparably harm BASE's goodwill and relationship with the public, with its investors, with its vendors, and with its long-time contractual partner, Caesars Palace. Accordingly, BASE asks that this court order RMP and its affiliates to take no action to stop the show or cancel the lease, and order that the terms of the production agreement continue to govern the conduct of the parties. (*Id.*).

RMP states that it neither seeks to repudiate any agreement nor "terminate" the use and license agreement with Caesars Palace, which governs the current run of the Absinthe show. Rather, the express terms of the first amendment to the license agreement make clear that the license agreement expires on October 21, 2016. (ECF No. 52). BASE and RMP agree that Absinthe is the creation and intellectual property of RMP. (ECF Nos. 52, 54). Consequently, according to

**James C. Mahan**
**U.S. District Judge**

- 5 -

RMP, BASE has no rights to any future production of Absinthe after the term of the current run at Caesars Palace. Although RMP has the "option" to continue the current production of the show Absinthe, which was created and is owned by Spiegelworld's affiliates, it is under no obligation to exercise that option for an additional two years beyond the terms of the lease agreement. (ECF No. 52).

As a threshold matter, BASE seeks a preliminary injunction on its claims for anticipatory repudiation and declaratory relief. (ECF No. 44). However, declaratory relief is not an independent cause of action. *Aguilar v. WMC Mortgage Corp.*, No. 2:09-cv-1416-ECR-PAL, 2010 WL 185951, at *4 (D. Nev. Jan. 15, 2010). Moreover, BASE's claim for declaratory relief is duplicative and asserts violations alleged in the other causes of action already contained in the complaint. *Josephson v. EMC Mortg. Corp.*, No. 2:10-cv-336-JCM-PAC, 2010 WL 4810715, at *3 (D. Nev. Nov. 19, 2010) ("Declaratory relief is a form of relief which is not intended to furnish the plaintiffs with a second cause of action for the determination of identical issues."). Therefore, the court will proceed only on BASE's claim for anticipatory repudiation.

a. *Likelihood of success on the merits*

BASE asserts that RMP is unilaterally and prematurely terminating the license agreement. RMP states that "Absinthe's run at Caesars Palace is controlled by the terms of the License agreement with Caesars," which ends on October 22, 2016, and RMP has "no obligation to [extend the agreement] particularly in light of BASE's deceit and misconduct." (ECF No. 44, Exh. 17). BASE claims these statements demonstrate clear and unequivocal intent to breach its contractual obligations. (ECF No. 44).

**i. Scope of the production agreement**

BASE claims that under the production amendment, RMP provided BASE the option to extend the agreement "for ongoing terms of six months" after the initial term of the amendment, which ended on October 21, 2012. (ECF No. 44, Exh. 3, at ¶ 1(a)). Both parties agree that the production amendment on its own provides no restriction on how long BASE has the option to extend the agreement, so long as BASE provides two months written notice for each term. (*See id.* ¶ 1(e)). The production agreement and amendment require that the show be performed at Roman

**James C. Mahan**
**U.S. District Judge**

- 6 -

1 Plaza at Caesars Palace. (*Id.* ¶ 1(b)). BASE's theory turns upon the contention that the license
2 agreement guarantees that Absinthe shall be performed for five years, unless Caesars Palace, or
3 BASE and RMP collectively, choose to withdraw. (ECF No. 44).

4 However, RMP asserts that while BASE's interpretation of the option clause in the
5 production amendment is correct, the production agreement itself applies only for the duration of
6 the license agreement. (ECF No. 52). The court agrees with RMP. The license agreement clearly
7 states: "The Term of the License shall commence on the Effective Date and continue for three (3)
8 years." (ECF No. 52, Ex. E §1.2). The term of the license agreement is three years and ends on
9 October 21, 2016.

10 Furthermore, despite BASE's argument that RMP will breach the amended production
11 agreement unless the term of the license agreement is extended, the production agreement clearly
12 limits BASE's role to the Absinthe production at Caesars Palace. (ECF No. 52). The production
13 agreement states: "[t]his agreement . . . is intended to define the rights and responsibilities of BASE
14 and RMP concerning [their] co-production of "Absinthe" (as defined herein) at Caesars Palace in
15 Las Vegas (the "Agreement")." (ECF No. 52 Ex. C). BASE's participation in Absinthe is limited
16 to its run at Caesars Palace, and is therefore limited by the terms of the license agreement with
17 Caesars. The parties' rights end under the production agreement when the license agreement
18 expires.

### ii. "Mutual option" to extend the license agreement

20 The license agreement provides the licensee with the "mutual option to extend the extend
21 the First Renewal Period for an additional (2) years . . . for a total of five (5) years from the
22 Effective Date." (*Id.*). BASE contends that this two-year extension is, essentially, "automatic."
23 (ECF No. 44). BASE claims that the license agreement was not intended to allow either BASE or
24 RMP to unilaterally terminate the lease. Rather, the mutuality required for the lease extension is
25 as between Caesars as licensor and BASE and RMP jointly as licensee. (ECF No. 44). BASE
26 claims that any ambiguity as to whether "mutual" requires the individual consent of RMP should
27 be resolved by looking to the expressed intent of the parties during the negotiations of the lease
28 amendment. *See, e.g.*, *Margrave v. Dermody Properties, Inc.,* 110 Nev. 824, 827 (1994) ("Where

James C. Mahan
U.S. District Judge

- 7 -

1  the meaning of a contract is ambiguous . . .[,] resort to extrinsic evidence is required to ascertain
2  the intention of the parties.").
3       BASE attempts to find ambiguity where none exists. As RMP correctly notes, while the
4  license agreement provides the licensee with the mutual option to extend the license agreement for
5  an additional two years, it is just that, an option to extend the term an additional two years if both
6  licensees agree. (ECF No. 52). The license agreement makes clear:

> Provided Licensee is not in breach of this Agreement and the Agreement has not otherwise been terminated in accordance with the Agreement, the Licensee shall have the mutual option to extend the First Renewal Period for an additional two (2) years ("Second Renewal Period"), for a total of five (5) years from the Effective Date.

11 (ECF No. 52, Exh, E at § 1.2). The plain language of the license agreement demonstrates that the
12 "mutual option" concerns the licensee, BASE and RMP, only. There is no reference to the licensor,
13 Caesars Palace, as holding any form of option.
14       BASE's insistence that the parties intended "mutual option" to be between the Licensee
15 and Caesars Palace is based upon e-mail communications between the parties and Caesars Palace.
16 However, not only do these e-mails neither support nor authorize the rewriting of the agreement's
17 terms, but, as RMP notes, they are barred by the parol evidence rule. In Nevada, the parol evidence
18 rule precludes a party from seeking to contradict the actual words to which they subscribe by
19 reference to purported pre-execution discussions that are different from the actual agreement. *See,*
20 *e.g., Daly v. Del E. Webb Corp.*, 96 Nev. 359, 361, (1980) (citing *Schieve v. Warren*, 87 Nev. 42
21 (1971)) ("The parol evidence rule forbids the reception of evidence which would vary or contradict
22 the contract, since all prior negotiations and agreements are deemed to have been merged
23 therein.").
24       A plain reading of the agreement shows that the parties agreed that both BASE and RMP,
25 jointly as licensee, would have to agree to a two-year extension of the license agreement beyond
26 October 21, 2016. Exercising the option creates a liability for both BASE and RMP to Caesars
27 Palace in the license agreement. (ECF No. 52, Exh. E).
28 . . .

James C. Mahan
U.S. District Judge

- 8 -

### iii. Role of the cooperation clause

Finally, BASE asserts that even if this court finds that the term "mutual" applies to RMP and BASE, RMP is still bound by the cooperation clause in Section 1.2 of the license agreement. The cooperation clause states that during the term of the license agreement:

> While on the Property, Licensee agrees to cooperate in all respects with the directions of Licensor's personnel, or any representative of Licensor. It is understood and agreed that if either BASE or Spiegelworld [RMP] voluntarily decide not to continue with the Show and Event, such non-continuing Party shall give at least sixty (60) days' notice to all Parties and shall cooperate with Caesars and each other to reasonably and in good faith take or caused to be taken all actions necessary and appropriate to allow the Show and Event to otherwise continue in accordance with this Agreement.

(ECF No. 52 Exh. E). BASE claims that the cooperation clause was approved by RMP and added specifically to "allow the show to continue if either BASE or [RMP] withdraws from the lease" (*Id.*). RMP asserts that the final two sentences of section 1.2 stem from BASE's early attempts to withdraw from the production. (*Id.*).

The cooperation clause clearly states that the licensee must cooperate during the term of the license agreement and outlines the parties' responsibilities to each other while the agreement is in effect; as such, this cooperation clause is clearly tied to the duration of the license agreement itself. When the license agreement ends, the cooperation agreement and any obligation to facilitate the production of Absinthe ends as well. The cooperation agreement cannot be read, as BASE suggests, as a means of bypassing the license agreement's expiration date and automatically extending the term for an additional two years.

The court finds unpersuasive BASE's arguments that the production agreement extends beyond the license agreement, that the two-year extension is "automatic," or that the cooperation clause binds the parties beyond the term of the license agreement. Therefore, BASE has not demonstrated a likelihood of success on the merits for its claims of anticipatory repudiation.

### b. Irreparable Harm

Before a preliminary injunction may issue, the plaintiff must show that he will suffer an irreparable injury and otherwise lacks an adequate remedy at law to prevent such injury. *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

James C. Mahan
U.S. District Judge

- 9 -

1  The mere "possibility" of irreparable harm is not enough to justify a preliminary injunction. As the Supreme Court made clear in *Winter*, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." 555 U.S. at 22; *see also Alliance*, 632 F.3d at 1131 ("Under *Winter*, plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction.") (emphasis omitted). The threat of irreparable harm must also be "immediate" to warrant preliminary injunctive relief. *See Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).

After considering the factors necessary to demonstrate irreparable injury, the court finds that BASE has not met its burden. BASE asserts that it will suffer irreparable harm because it will be wrongly forced to shut down Absinthe unless RMP and its affiliates are enjoined from leaving the show. (ECF No. 44). BASE claims that RMP's stated threats and actions have fundamentally threatened the rights of BASE and have cast the entire Absinthe production into "chaos." (*Id.*). BASE is unable to appropriately plan, utilize assets, sell tickets, market the show, enter into contracts, or conduct any of its multiple duties for the benefit of the show. BASE also claims that the Absinthe brand and BASE's reputation are being jeopardized. (*Id.*).

However, BASE's claims rely on the false premise that it is entitled to profits and involvement in the production of Absinthe beyond the terms of the license agreement as written. BASE's assertion that RMP's actions have harmed the Absinthe brand rings hollow. RMP is simply choosing not to extend the term of the show at Caesar's Palace, a valid option under the terms of the contract. Both parties agree that Absinthe is RMP's intellectual property. (ECF Nos. 52, 54). BASE cannot claim that it is harmed by not being allowed to participate in a future production in which it has no right to participate.

*c. Balance of the hardships*

In seeking a preliminary injunction, a plaintiff must demonstrate that his claim presents a serious question of law and that the current litigation has merit so as to avoid undue harm to the defendant. *See Topanga Press, Inc. v. City of Los Angeles,* 989 F.2d 1524, 1528 (9th Cir. 1993).

**James C. Mahan**
**U.S. District Judge**

- 10 -

1  Even if the balance of hardships tips in favor of the moving party, "it must be shown as an
2  irreducible minimum that there is a fair chance of success on the merits." *Stanley v. Univ. of S.*
3  *California*, 13 F.3d 1313, 1319 (9th Cir. 1994).

4  The court does not find that BASE's claim for anticipatory repudiation is likely to succeed
5  on the merits. An injunction compelling RMP and affiliates to exercise the option and thereby
6  extend the License Agreement with Caesars Palace for an additional two years would not merely
7  maintain the status quo; it would breach the terms of the agreement and prevent RMP from
8  capitalizing on its ownership rights and entering into a longer term agreement elsewhere on better
9  economic terms. Consequently, the balance of hardships also favors RMP.

    *d.  Public interest*

Before granting a preliminary injunction the court must determine whether the injunction is in the public's interest.  *See Winter*, 555 U.S. at 20–22.  The right to contract is fundamental and includes the privilege of selecting which companies and individuals one chooses to work with and under what terms the parties will work together.  Denial of an injunction in this instance protects the public's interest in the integrity and enforceability of contracts.  Therefore, the court finds that the public interest favors denial of a preliminary injunction in this instance.

**IV.   Conclusion**

After reviewing the documents and pleadings on file in this matter, the court finds that BASE has not satisfied the requirements for issuance of a preliminary injunction.

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that plaintiff BZ Clarity Tent Sub LLC, dba BASE Entertainment's ("BASE") motion for preliminary injunction (ECF No. 44) be, and the same hereby is, DENIED.

IT IS SO ORDERED June 28, 2016.

_____
UNITED STATES DISTRICT JUDGE

James C. Mahan
U.S. District Judge